IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
July 20, 2011 Session

## IN RE: ASKIA K. B.

**Appeal from the Shelby County Chancery Court**
**No. CH-09-1538-3   Kenny W. Armstrong, Chancellor**

---

**No. W2010-02496-COA-R3-PT - Filed October 7, 2011**

---

This appeal concerns the termination of parental rights. While the appellant father was incarcerated, the child was taken into protective custody because of the mother's drug use. The mother surrendered her parental rights. The father remained incarcerated. After a trial, the father's parental rights were terminated on several grounds, including failure to comply with the permanency plan. The father appeals, and on appeal the State waives all grounds except for failure to comply with the permanency plan. After review of the record, we conclude that this ground for termination was not established because the record does not show clear and convincing evidence that the Department of Children's Services made reasonable efforts to assist the father and to reunify parent and child. Therefore, we reverse.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed in Part, Affirmed in Part, and Remanded**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and DAVID R. FARMER, J., joined.

Shantell Sharay Suttle, Esq., Cordova, TN for Respondent/Appellant K.B.

Robert E. Cooper, Jr., Attorney General and Reporter, Joshua Davis Baker, Assistant Attorney General, for Petitioner/Appellee Tennessee Department of Children's Services

### OPINION

#### FACTS AND PROCEEDINGS BELOW

The child at issue in this appeal, Askia K. B. ("Askia"), was born to T.L.R ("Mother") on May 5, 2003, in Shelby County, Tennessee. ("Father") is listed as the father on the child's

birth certificate. Mother and Father were never married to each other. After Askia was born, Father resided with Mother and the child.

On October 7, 2007, Father was arrested for allegedly attempting to hit Mother's new boyfriend with a bat.[1] Father claimed that the boyfriend came to his home, made threats, and refused to leave. Immediately following the arrest, Father was initially incarcerated at the Shelby County Jail ("201 Poplar"). On February 12, 2009, Father pled guilty to aggravated assault and domestic violence.[2] He was sentenced to six years incarceration at the Shelby County Penal Farm ("Penal Farm").

Meanwhile, while Father was incarcerated, Askia continued to live with Mother. As a result of Mother's persistent drug use and related problems, Petitioner/Appellee Tennessee Department of Children's Services ("DCS") removed Askia from Mother's custody on April 2, 2008. The protective custody order did not mention Father. Askia was placed in foster care. Prior to the child's placement in foster care, there was no assessment of Askia's behavior.

Initially upon being placed in foster care, Askia exhibited considerable behavioral problems and was disruptive and volatile. As a result, during the first five weeks in foster care, Askia was relocated to five different foster homes. Askia was later diagnosed with attention deficit hyperactivity disorder ("ADHD") and developmental delay, and he displayed sexualized behavior. On June 16, 2008, Askia was placed in his current foster home. His behavior eventually improved and he has remained in the same foster home.

Meanwhile, on May 1, 2008, DCS created an initial permanency plan for Askia. At this time, Father was still incarcerated. The initial permanency plan had dual permanency goals of reunification with his parents or adoption. The plan indicated that Father "needs to take" anger management and domestic violence counseling and training, as well as parenting classes. The initial plan did not specifically address Father's visitation. This plan was signed by Father on May 6, 2008 and ratified by the Juvenile Court on May 13, 2008.

On July 7, 2008, DCS created a revised permanency plan with the same dual goals of reunification and adoption. The provisions in the plan pertaining to Father remained

_____

[1]Mother later had a child with the boyfriend. That child, Askia's half-sibling, was also taken into protective custody by DCS, and both Mother and the boyfriend eventually surrendered their parental rights as to the child. The half-sibling was placed in the same foster home as Askia, and remains there.

[2]The DCS case manager for Askia later referred in her testimony to having attended Father's criminal trial. It is unclear whether Father entered a plea after the trial was underway.

unchanged, except that the plan provided for him to have supervised visitation with Askia and to send letters to the child. Father remained incarcerated. The section on visitation in the revised plan stated that Father was required to contact DCS to request visitation and arrange transportation for the child and supervision of the visitation through DCS. Under "Parent's Responsibilities," the revised plan states that Father "will contact [DCS] within 48 hours to schedule visits with the child." Father signed this revised plan, as well as the general criteria for termination of parental rights.

On October 3, 2008, Askia was adjudicated dependent and neglected. As the reason, the order cited Mother's persistent substance abuse.

On February 20, 2009, DCS created a second revised permanency plan with the same dual goals of reunification and adoption. The second revised plan indicated that Father was to participate in supervised visitation with Askia, and take anger management, domestic violence, and parenting classes. He was also to get involved with Askia's treatment and school, learn how to address Askia's behavioral problems, obtain stable housing and income, and "support Askia while he is in custody." This second revised plan was not signed by Father, and the record does not reflect that it was discussed with him.

On July 23, 2009, DCS filed a petition in the Chancery Court of Shelby County to terminate Father's paternal rights as to Askia.[3] As grounds for termination, DCS alleged abandonment,[4] failure to substantially comply with the permanency plans,[5] and persistent conditions.[6]

On September 22, 2009, a third revised parenting plan was issued with the same dual goals of reunification and adoption. The provisions in this plan were similar to those in the February 20, 2009 plan. The third revised plan specified that Father "will attend and participate in visits with Askia." It also indicated that Father was to get involved in Askia's treatment and education upon his release from jail and undergo a mental health assessment.

---

[3]The petition included Askia's half-sibling, Mother's other child, and sought to terminate Mother's parental rights as to both children and the unknown father of the sibling. As noted above, Mother ultimately surrendered her parental rights as to both children. The parental rights of the unknown father of the sibling were terminated as well. No issue on appeal is raised as to the termination of the parental rights of Mother or the unknown father.

[4]Tenn. Code Ann. §§ 36-1-113(g)(1) (2010) and 36-1-102(1)(A)(iv) (2010).

[5]Tenn. Code Ann. § 36-1-113(g)(2) (2010).

[6]Tenn. Code Ann. § 36-1-113(g) (2010).

The third revised plan was ratified by a Juvenile Court Magistrate on January 4, 2010. Father did not sign the plan, and there is no indication in the record that it was discussed with him.

On August 24, 2010, the trial court conducted a bench trial on the DCS petition to terminate Father's parental rights. Father was still incarcerated at this time but was present for the proceeding. The trial court heard testimony from the DCS case manager, Father, Askia's foster mother, and Askia's Youth Villages foster care counselor.

The pertinent facts were outlined in the testimony from the DCS case manager, D'Andrea Long ("Long"). Long testified that she had visited with Father while he was incarcerated on five separate occasions since Askia was removed from Mother's custody on April 2, 2008. She said that three of the visits, on May 6, 2008, July 10, 2008, and September 8, 2008, took place at 201 Poplar. Father was transferred to the Penal Farm, after entry of his guilty plea on February 12, 2009. Long testified that she visited Father in January 2010 and on June 4, 2010, at the Penal Farm. The 2010 Penal Farm visits occurred after the termination petition was filed.

In her first visit with Father at 201 Poplar on May 6, 2008, Long said she talked with him about the provisions in the permanency plan concerning visitation with Askia at the jail. Long said that Father responded that it would not be "in Askia's best interest at the time to come visit him [in jail] because Askia is used to touching him and them interacting one-on-one, and he felt it would be traumatizing" to the child to be limited to talking to Father through a phone and seeing him through a screen. Long testified that Father insisted that he would be getting out of jail soon and would be able to visit with Askia once he was released. Long testified that this remained Father's stance on visitation with the child, and he did not request a visit with Askia until Long's June 4, 2010 visit with him at the Penal Farm, after the termination petition was filed. At the June 4, 2010 visit, Long said, she told Father that she would bring Askia to visit upon his request. Apparently, no such visit with Askia occurred.

Long also testified that she talked with Father during a visit to 201 Poplar about the anger management, domestic violence, and parenting classes (collectively "classes") provided for in the permanency plan. Long said that these classes were offered by "the prison."[7] In her discussion with Father, Long said, Father said that he did not want to take the classes offered by the prison because they were taught by inmates and he wanted to avoid conflict. Long said that Father indicated that he preferred to take the classes with a neutral party outside the

_____

[7]Long did not specify in her testimony whether "the prison" meant 201 Poplar or the Penal Farm. Her subsequent testimony about her conversation with Father seems to imply that the classes were offered at 201 Poplar, but is unclear.

-4-

jail. Long testified that they briefly discussed finding someone to come to the jail to give him the classes. As with the visitation, Father indicated his belief that he would be released from jail soon and could take the classes after he was released.

In her July 10, 2008 visit, Long testified, she reviewed the July 7, 2008 permanency plan with Father. She also had him sign an acknowledgement that he received the criteria  and procedures for termination of parental rights. Long said that she did not discuss visitation with Father at her visits in either September 2008 or January 2010. In the January 2010 visit, Long said, she updated Father on the petition to terminate his parental rights and ascertained whether Father had made progress on completing the specified classes. She determined he had not made progress.

Long testified about her discussion with Father regarding visitation with Askia in her June 4, 2010 visit to the Penal Farm. In that visit, she said, Father requested visitation with Askia, and she responded that she would bring the child to the Penal Farm at his request. Long testified that she was told by Penal Farm personnel that Father had to be enrolled in the prison's fatherhood program in order for the child to be brought to visit him.

The State did not submit any documentary evidence reflecting the policies of the Penal Farm on children's visits with inmates and the prison's fatherhood program. The record contains no documents indicating any visits with Father by DCS personnel between September 2008 and January 2010. In her testimony, Long acknowledged that she made no visits to Father during the entirety of  2009. Long explained that she took time off from work during 2009 and other DCS employees were overseeing her cases. Long was unsure whether Father was sent the updated February 20, 2009 permanency plan.[8] She claimed to have sent Father unspecified letters but did not explain further.

Long acknowledged receiving letters from Father updating her on his criminal case and expressing concern for his son. In February 2010, Long said, she received a letter from Father intended for Askia, which she delivered to the child.

Long testified that Father signed both the May 1, 2008 and July 7, 2008 permanency plans, but did not sign either the February 20, 2009 plan or the September 22, 2009 plan. Long asserted generally that she reviewed the permanency plans with Father, but did not specify which plans she reviewed with him. Long claimed that each of the plans required Father to contact DCS to request visitation, be present for the scheduled visits, provide for Askia, participate in family counseling upon release, and complete anger management classes,

---

[8]Long initially claimed that the February 2009 permanency plan was sent to Father, and later retreated from that testimony.

domestic violence counseling, and parenting classes. Long said that Father did not complete any of the requirements in the permanency plan. Long conceded that she was not sure that it was reasonable for DCS to expect Father to provide support for Askia while he was incarcerated.

Long testified that she observed Askia with his foster mother. She described their interaction as loving and said that she could tell that Askia respected the foster mother and followed her directions. Long testified that she believed it was in Askia's best interest to terminate Father's rights in order to provide Askia with permanency and stability.

Father testified at the trial as well. Father admitted that he injured Mother's boyfriend with a baseball bat, but claimed that the boyfriend had come to Father's home and threatened him and his family. Under a plea agreement, Father pled guilty to aggravated assault and domestic violence.[9] Prior to the plea agreement, Father was incarcerated at 201 Poplar. While there, he expended considerable effort to "fight" the criminal charges against him. After entering into the plea agreement in February 2009, Father was incarcerated at the Penal Farm. Father said that Long visited him several times at 201 Poplar, but only once at the Penal Farm. Long told him that Askia had been taken into DCS custody and reviewed the 2008 permanency plan with him.[10] Specifically, Long discussed with Father the provision in the permanency plans stating that he needed to take classes or counseling in anger management, domestic violence, and parenting.

In 2010, Father said, during her visit with him at the Penal Farm, Long asked him about the classes he was to take, pursuant to the permanency plans. Father said that he told Long that the prison offered fatherhood classes, but he did not know whether anger management classes were offered. Father said that, at the time he met with Long, the fatherhood classes had already started. Father explained that the prison offered the fatherhood program "on terms" and "[o]nce it starts, you can't enter into it. You have to wait until the term is over."

Father acknowledged receiving various letters in the mail from DCS, but described the enclosed documents as being outdated. Father claimed that he responded to the DCS letters on a couple of occasions, but never received a reply. Father testified that he attempted to call Long a couple of times but reached only her answering service. Father said that he requested and received pictures, updates, and Askia's report cards. He also got a revised permanency plan, but it was never explained to him.

---

[9]Father indicated that the guilty plea was an "Alford" plea, in which he pled guilty but did not admit culpability.

[10]At one point, Father denied that Long reviewed the permanency plans with him, but he later recanted.

When asked about his conversations with Long regarding visitation with Askia, Father said that he discussed visitation with Long while he was incarcerated at 201 Poplar. Father did not recall telling Long not to bring Askia to see him because not being able to touch him would frustrate the child. Father indicated that he asked Long to bring the child to visit him, and she responded that doing so at the jail was "a complicated situation." Father said that he observed other prisoners at 201 Poplar visiting with their children and stated that he would have wanted to have Askia visit, had he been given the opportunity.

Father acknowledged that, as of the date of the trial, he had not spoken to Askia in two years. Father claimed he tried to contact his son, but did not have the child's telephone number or contact information. He acknowledged not having done anything for the child's most recent birthday. Father maintained, however, that he requested, and received, updates and photos on Askia, wrote letters showing his interest and concern about his son, and wrote one letter to Askia, which he gave to Long.

The trial court also heard testimony from Askia's foster mother ("Foster Mother"). Foster Mother testified that she had been caring for Askia for approximately two years.[11] Foster Mother stated that Askia receives weekly counseling and psychiatric care. She explained that the child has been diagnosed with ADHD and needs a structured setting, and said that he has come a long way. Foster Mother said she has a close bond with the child. When asked if she intended to adopt Askia, Foster Mother replied, "Yes. It's a very likely possibility."

Askia's Youth Villages counselor testified that she observed Askia interact with Foster Mother and said that he was very respectful towards Foster Mother and listened well when she told him to do something. The Youth Villages counselor said that Askia had made "extraordinary strides and progress" since he came into Foster Mother's care, and that Foster Mother's home was "a suitable place" for Askia. At the conclusion of the testimony, the trial court took the case under advisement and asked the parties to submit proposed findings of fact and conclusions of law.

On October 28, 2010, the trial court entered a lengthy order, apparently proposed by DCS, terminating Father's parental rights.[12] Pertinent to this appeal, the trial court found that

---

[11]As noted above, Foster Mother was also fostering Mother's younger child, Askia's half-sibling. She indicated that it was "likely" that she would want to adopt both children.

[12]The heading on the order says "Proposed Order," but it was in fact signed by the trial judge. The order also included findings of fact and conclusions of law related to Mother, Mother's younger child, and the unknown father of the younger child.

Father had willfully failed to visit and willfully failed to pay financial support for his son. The trial court specifically credited Long's testimony that she told Father that he needed to visit the child and offered to bring the child to the prison facility, and that Father responded by saying "that he did not want to visit the child while he was incarcerated." This was deemed to be abandonment by failure to visit. The trial court also found that, by virtue of his conviction for assault, Father abandoned the child by engaging in conduct that exhibited a wanton disregard for the welfare of his child.

Pursuant to Tennessee Code Annotated § 36-1-113(g)(2), the trial court found that Father had failed to substantially comply with the permanency plan, by failing to contact DCS to request visits, failing to complete anger management, domestic violence, and parenting classes, failing to "obtain stable income and housing," failing to "provide support for the child," and failing to "participate in family counseling upon release from prison." It found that DCS "made reasonable efforts to assist [Father] in complying with the tasks of the plan by offering to transport the child to prison to visit with [Father] and by ensuring that [Father] could complete the anger management, domestic violence, and parenting classes at the prison." The trial court found that Father "failed to participate in visitation" and "did not attend any of the classes offered by the prison," despite having been made aware that failure to comply with the permanency plan could result in termination of his parental rights.

The trial court's order stated that Father "admitted that he had never requested visitation with Askia." As to the courses provided for in the permanency plan, the order states that Long "testified that she explained to [Father] that there were several programs that would allow him to serve his sentence and complete the classes required of him." The order recounted that Father's response was that he was too busy with his criminal case to comply.

The trial court's order also found that, pursuant to Tennessee Code Annotated § 36-1-113(g)(3), the conditions that led to Askia's removal still persisted, and other conditions prevented the child's safe return to Father's custody. To support this ground, the order recited that Father remained incarcerated for assault, that he had not participated in classes to address his anger, violence, and parenting issues, and he refused to visit the child. The trial court determined that there was clear and convincing evidence that it was in the best interest of Askia that Father's parental rights be terminated. From this order, Father now appeals.

**ISSUES ON APPEAL AND STANDARD OF REVIEW**

We note at the outset that, on appeal, DCS has waived several grounds for termination: abandonment by willful failure to support, willful failure to visit, and wanton disregard, under Tennessee Code Annotated §§ 36-1-113(g)(1) and 36-1-102(1)(A)(i) and (iv), and

persistent conditions under Tennessee Code Annotated § 36-1-113(a)(3). The only remaining ground, then, is failure to substantially comply with the permanency plan, under Tennessee Code Annotated § 36-1-113(g)(2).

On appeal, Father argues that the trial court erred by finding by clear and convincing evidence that he failed to substantially comply with the permanency plan, that the requirements in the plans as they related to Father were reasonable, and that DCS made reasonable efforts to reunify Father and Askia or to maintain the bond between them.[13] Father also argues that the trial court erred in finding clear and convincing evidence that termination of his parental rights was in the best interest of Askia.

A biological parent's right to the care and custody of his or her child is among the oldest of the judicially recognized liberty interests protected by the due process clauses of the federal and state constitutions. *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L. Ed.2d 49 (2000); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993); *In re Giorgianna H.*, 205 S.W.3d 508, 515 (Tenn. Ct. App. 2006). While this right is fundamental and superior to the claims of other persons and the government, it is not absolute. *In re Giorgianna H.*, 205 S.W.3d at 215. It continues without interruption only so long as the parent has not relinquished it, abandoned it, or engaged in conduct requiring its limitation or termination. *Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002); *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004).

Termination proceedings are governed by statute in Tennessee. A party with standing to seek the termination of the parental rights of a biological parent must first prove at least one of the statutory grounds for termination. Tenn. Code Ann. § 36-1-113(c)(1) (2010). Secondly, the party seeking termination must prove that termination of the parental rights of the biological parent is in the child's best interest. Tenn. Code Ann. § 36-1-113(c)(2). Because of the profound consequences of a decision to terminate parental rights, courts must apply a higher standard of proof. Therefore, the elements required for termination of parental rights must be proven by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d at 809; *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

This heightened burden of proof in parental termination cases minimizes the risk of erroneous decisions. *See In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Evidence that meets the clear and convincing standard "establishes that the truth of the facts asserted is highly probable, and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re Audrey S*., 182 S.W.3d 838,

---

[13]The other issues raised by Father pertained to grounds waived on appeal by DCS, so it is not necessary to address them in this Opinion.

861 (Tenn. Ct. App. 2005) (citations omitted). "It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." ***Id.*** (citations omitted); ***see also In re A.D.A.***, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002).

In light of the clear and convincing standard of proof, a reviewing court must "distinguish between the specific facts found by the trial court and the combined weight of those facts." ***In re Tiffany B.***, 228 S.W.3d 148, 156 (Tenn. Ct. App. 2007). When a trial court has seen and heard witnesses, considerable deference must be accorded to the trial court's findings as to the credibility of the witnesses. ***Seals v. England/Corsair Upholstery Mfg. Co.***, 984 S.W.2d 912, 915 (Tenn. 1999). Using the standard under Rule 13(d) of the Tennessee Rules of Appellate Procedure, the trial court's specific findings of fact are first reviewed to determine whether they are supported by the preponderance of the evidence; these facts are presumed to be correct unless the evidence preponderates against them. Tenn. R. App. P. 13(d); ***Union Carbide Corp. v. Huddleston***, 854 S.W.2d 87, 91 (Tenn. 1993). We then determine whether the combined weight of the facts, as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish all of the elements required to terminate the biological parent's parental rights. ***In re Tiffany B***., 228 S.W.3d at 156; ***In re S.M.***, 149 S.W.3d 632, 640 (Tenn. Ct. App. 2004). The trial court's conclusions of law, including its conclusion that the State presented clear and convincing evidence to support termination, are reviewed *de novo* on the record, affording them no presumption of correctness. ***Campbell v. Florida Steel Corp.***, 919 S.W.2d 26, 35 (Tenn. 1996); ***Presley v. Bennett***, 860 S.W.2d 857, 859 (Tenn. 1993); ***In re Tiffany B***., 228 S.W.3d at 156.

## ANALYSIS

### Compliance with Permanency Plan

The sole ground for termination on which DCS relies is substantial noncompliance with the permanency plan under Tennessee Code Annotated § 36-1-113(g)(2). This subsection states that termination of parental rights may be based on a finding by clear and convincing evidence that: "[t]here has been substantial noncompliance by the parent . . . with the statement of responsibilities in a permanency plan . . . ."

For each child placed in foster care by DCS, Tennessee requires the development of an individualized plan of care that sets forth DCS responsibilities and parental responsibilities that are reasonably related to achievement of the plan's goals; here, reunification or adoption. Tenn. Code Ann. §§ 37-2-403(a)(1)(A) and (2)(A) (2010). Parents are responsible for addressing the conditions that either led to the child's removal or prevent the child's safe return to the parent's custody, and they must make reasonable efforts once DCS has made

services available to them.  *In re Tiffany B.*, 228 S.W.3d at 159; *Chase A.C.*, No. E2009-01952-COA-R3-PT, 2010 WL 3257711, at *18. (Tenn. Ct. App. Aug. 18, 2010).  In the case at bar, the trial court found that the requirements set forth in the permanency plan were "reasonable and related to the reasons necessitating foster care for Askia."

### *Operative Plan and Responsibilities*

At the outset, it is important to establish which permanency plan is operative in this case. Although revised permanency plans were staffed in February 2009 and July 2009, the appellate record contains no indication that either were actually received by Father.  It is undisputed that neither were signed by Father, no DCS case worker was in contact with Father or visited him during 2009, and there is no evidence that either 2009 plan was sent to him.  The termination petition was filed in July 2009.  Consequently, for purpose of our analysis, the operative permanency plans for determining Father's compliance are the plans Father signed in May 2008 and July 2008.

The statutory language directs us to look at the "statement of responsibilities" for Father in each of the 2008 permanency plans.  *See* Tenn. Code Ann. § 36-1-113(g)(2) ("substantial noncompliance by the parent . . . with the *statement of responsibilities* in a permanency plan. . . ."). The initial permanency plan, dated May 1, 2008, lists Mother's continuing substance abuse as the reason why Askia was taken into protective custody.  In the section on visitation, the permanency plan notes that there is no court order addressing visitation, and after Mother's name, the box for "supervised visits" is checked.  Father is not mentioned in this section.  The section on "Parent's Responsibilities" states: "The parents will contact [DCS] at least 24 hours in advance to schedule visits with the child," and "will be present at each scheduled visit."  The section on "Parent's Responsibilities" does not mention classes of any kind.

Father is specifically mentioned in the section of the initial permanency plan entitled "Action Plan for Permanency" with the desired goad set as "Reunify With Parent(s)."  Under "Action Needed to Achieve Desired Outcome," the plan states that Father "needs anger management & domestic violence training/counseling" and "needs parenting classes."  November 1, 2008 is written in as the expected achievement date.

The July 2008 permanency plan similarly lists Mother's substance abuse as the reason why the child is in State protective custody.  As with the first plan, the section on visitation notes that there is no court order addressing visitation.  Unlike the first plan, however, Father is listed and the box for "supervised visits" is checked.  The section on "Parent's Responsibilities" states that Father "will contact [DCS] within 48 hours to schedule visits

with the child" and "will be present at each scheduled visit." The section on "Parent's Responsibilities" does not mention classes.

The section in the July 2008 plan on "Child and Family Needs" again states that Father "needs anger management and domestic violence training/classes and parenting classes." After adding that Father is incarcerated, it states that he "needs to support his child while the child is in DCS custody." Under the actions needed to achieve the goal of reunification, the plan states that Father "needs to take anger management, domestic violence and parenting classes."

Thus, the initial permanency plan does not clearly state that visiting with Askia is a "responsibility" of Father under the plan, but allows for such visits. Similarly, the section of the initial plan on responsibilities does not mention domestic violence, anger management, and parenting classes, but the section on "actions" states that Father "needs" such classes.

The revised July 2008 permanency plan specifically states as a "responsibility" of Father that he is to contact DCS "within 48 hours" to schedule a visit with Askia. As with the initial plan, the classes are not listed under his "responsibilities," but under "actions," the plan says that Father "needs to take" the classes or counseling. We note that the statute that sets out this ground for termination states that parental rights may be terminated where there is substantial noncompliance "with the *statement of responsibilities*" in the permanency plan. Tenn. Code Ann. § 36-1-113(g)(2).

### *DCS Reasonable Efforts*

Father argues on appeal that DCS did not make reasonable efforts to reunify him with his son. In its appellate brief, DCS recites its actions with respect to Father, but does not specifically address whether DCS made reasonable efforts.

Under the Tennessee statutes governing termination of the parental rights of a biological parent, in most instances in which a child has been removed from a parent's home, DCS is required to make "reasonable efforts" to reunify the parent with the child.[14] The term "reasonable efforts" is statutorily defined as "the exercise of reasonable care and diligence . . . to provide services related to meeting the needs of the child and the family." Tenn. Code Ann. § 37-1-166(g)(1). Caselaw has elaborated on the efforts required by DCS, observing: "The Department's employees must use their superior insight and training to assist the

---

[14]For example, under Tennessee Code Annotated § 37-1-166(g)(4), reasonable efforts are not required in cases involving aggravated abuse, neglect or sexual exploitation. None of these circumstances is present in the instant case.

-12-

parents in addressing and completing the tasks identified in the permanency plan." *In re Chase A.C.*, 2010 WL 3257711, at \*18 (quoting *In re Giorgianna H.*, 205 S.W.3d at 519. The State has the burden of showing by clear and convincing evidence that it brought its skills, experience, and resources to bear in a reasonable way to bring about the reunification of the family. *In re Tiffany B.*, 228 S.W.3d 148, 160 (Tenn. Ct. App. 2007).

In light of this standard, we examine Long's testimony outlining her efforts on this case.[15] We focus, of course, on the DCS efforts prior to the filing of its petition to terminate Father's parental rights, on July 23, 2009.

We first examine DCS's efforts on visitation. In her first visit with Father on May 6, 2008, Long said "yes" in response to a question on direct examination, asking her if "it was a possibility that either yourself or the foster parent could bring Askia [to 201 Poplar] to visit [Father]." Long testified that Father responded by saying that it would traumatize the child to visit him at the jail,[16] and stating his belief that he "should be getting out of jail soon" and would see Askia after he got out.

As noted above, at the time of Long's first visit with Father, the permanency plan referred to supervised visitation by "the parents" but did not state that visitation by Father was a requirement.

In reference to her July 2008 visit with Father at 201 Poplar, Long said only that she "addressed" visitation with Father and his response was "the same." The July 2008 permanency plan refers to Father's visitation in the "Parent's Responsibilities" section of the plan. Long said that she did not discuss visitation at all in her September 2008 visit with Father. Long said that Father did not request to have Askia brought to visit him.[17]

That is the sum total of DCS's efforts, prior to the termination petition, on Father's responsibility under the permanency plan as to visitation. In Long's May 2008 visit, visitation was not Father's "responsibility" under the permanency plan, and Long does not testify that she told Father that it was a responsibility. By the time of Long's July 2008 visit with Father, contacting DCS to schedule visitation with Askia was listed as a responsibility of Father under the plan, but Long tells us nothing about her conversation with Father except

---

[15]Although the trial court did not make an express credibility determination, to the extent that Long's testimony differed from Father's testimony, it appears that the trial court implicitly credited Long's testimony. There is no evidence on the efforts of any other DCS employee regarding Father in this case.

[16]Father disputed making this statement to Long. We presume that the trial court credited Long's testimony.

[17]Father disputed this statement.

that visitation was discussed. There is no indication that she pointed out to Father that visits with Askia had shifted from "a possibility" to a "responsibility."

Moreover, there is no indication in Long's testimony of her reply to Father's stated belief that jailhouse visits would be traumatic for the child, and that jailhouse visits were unnecessary because he would not be in jail much longer. Father's assertion that a jailhouse visit by a then-five-year-old child would be difficult for the child was not unreasonable. Presumably, DCS took the position that the difficulties to the child of such a visit were outweighed by the erosion to the parent/child bond caused by the lack of in-person contact. If so, there is no indication in the record that this or any other reasoning by DCS was communicated to Father in the July 2008 visit. Nor did Long's testimony indicate that she sought to disabuse Father of his naive belief that he should postpone visitation because he would not be in jail for long. Overall, as to visitation, the record does not indicate that DCS employees "use[d] their superior insight and training to assist [Father] in addressing and completing" his responsibility as to visitation. *In re Giorgianna H.*, 205 S.W.3d at 519.

Moreover, after Father pled guilty in February 2009, and at that point knew he would not be getting out of jail soon, no DCS employee visited him. DCS simply filed its termination petition in July 2009, a full year after Long's last conversation with Father on visitation.

We next consider the reasonableness of DCS efforts as to Father's attendance at classes in anger management, domestic violence, and parenting, again, prior to the filing of the petition to terminate in July 2009. We assume *arguendo* that taking the classes was a "responsibility" of Father under the July 2008 permanency plan, even though classes are not mentioned in the section on "Parent's Responsibilities." Long's testimony on her efforts, prior to the filing of the petition, was as follows:

> Q: To your knowledge, were the anger management, domestic violence, and parenting classes offered by the prison?
> A: Yes.
> Q: When you asked [Father] to take part in the classes, what, if any, response did he give you?
> A: When we initially talked about it when he was at 201 [Poplar], he stated he did not want to take the classes while he was there because some of the inmates were teaching the classes and he didn't want there to be any conflict and preferred to take the classes with a neutral party outside the jail. And, again, he stated he assumed he would be released soon and would be able to get out and then take the classes.

-14-

Q:    . . . [D]id you offer to find someone to come give him the class while in jail?

A:    We briefly spoke about it, but he stated he felt he would get out sometime soon and wanted to take the classes then.

Thus, Long testified that, prior to the filing of the termination petition, she and Father had a single conversation about the classes at one of her three visits to him in 2008, and he gave her a reason why he preferred not to take the classes offered at the jail. There was an inconclusive discussion about Long arranging for a counselor to come to the jail, and Father clung to the belief that he would not be in jail long. There is no indication from Long's testimony that she told Father that the classes were his "responsibility" under the plan. Again, if she attempted to dissuade him from relying on his misguided assumption that he would be released from jail soon, this does not appear in her testimony.

Long does not indicate that there was any followup to this single conversation, prior to the filing of the termination petition in July 2009. There was no visit with Father after his February 2009 guilty plea. Indeed, for over *ten months* prior to the filing of the petition, DCS employees made no visits to Father at all.[18] No reason is offered by DCS for the failure to communicate with Father during this time.

From the evidence in the record, prior to the filing of the termination petition, DCS efforts to work with Father, to provide assistance to him in completing his responsibilities under the 2008 permanency plans, were perfunctory at best.[19] Under these circumstances, we must conclude that the State failed to carry its burden of proving by clear and convincing evidence that it made reasonable efforts to assist Father and to reunify Father with his son. Therefore, we must reverse the trial court's finding that DCS's efforts in this case were reasonable.[20]

---

[18]Father testified at trial that he tried to contact Long, but was only able to reach her answering service.

[19]We focus on DCS efforts prior to the filing of its petition to terminate Father's parental rights. However, to the extent that DCS efforts after the filing of the petition are pertinent, DCS efforts in 2010 appear to have been desultory as well. On visitation, Father said he explained to Long in June 2010 that, in order to receive visits, he had to be enrolled in the prison's fatherhood program, and could not enroll until the current term ended. DCS did not dispute this testimony. Assuming that Long's brief testimony that classes were offered at "the prison" was in reference to classes at 201 Poplar, there is no evidence in the record that the domestic violence and anger management classes were available to Father at the Penal Farm, and the only evidence on a parenting class indicates that Father could not enroll until the term of classes ended.

[20]Some of the other findings by the trial court find little or no basis in the record. The trial court's order states that Father "admitted that he had never requested visitation with" his son. This is simply inaccurate; even if his testimony was not deemed credible, Father maintained that he asked to see his son, and Long

(continued...)

-15-

Accordingly, we must reverse the trial court's holding on the single ground for termination, substantial compliance with the permanency plan.

### *Best Interest*

Although the termination of Father's parental rights must be reversed on the basis of DCS's reasonable efforts, we go on to address the trial court's finding on the best interest of the child, as the child's best interest is always of primary importance.

In this case, the trial court found clear and convincing evidence that termination of Father's parental rights would be in the best interest of his son Askia. We agree. From the record, it is clear that Askia is a special needs child, and that Foster Mother has forged a strong bond with him and is able to give the child the loving, structured, supportive environment he needs, in a home that he shares with his half-sibling, Mother's younger child. Because of his lengthy incarceration, Father has no meaningful relationship with Askia, and nothing in the record indicates that Father will be able to provide an appropriate home for a special-needs child such as Askia. Therefore, the trial court's finding on best interest is affirmed.

### CONCLUSION

In sum, on appeal, DCS has waived all grounds for termination of Father's parental rights except substantial noncompliance with the permanency plan under Tenn. Code Ann. § 36-1-113(g)(2). In order to terminate parental rights on this ground, DCS must show by clear and convincing evidence that it exerted reasonable efforts to assist the parent in complying with the plan and to reunify parent and child. We reverse the trial court's finding that DCS proved reasonable efforts by clear and convincing evidence. This holding requires that we reverse the trial court's finding on the ground of substantial noncompliance with the permanency plan. This is the only ground for termination remaining on appeal.

For completeness, we addressed the best interest of the child, affirming the trial court's finding that termination would be in Askia's best interest. However, in the absence of grounds for termination, the termination of Father's parental rights must be reversed.

---

[20](...continued)
responded that such a visit was "a complicated situation." The trial court's order found that Father failed to substantially comply with alleged responsibilities in the permanency plan by failing to "obtain stable income and housing," failing to "provide support for the child," and failing to "participate in family counseling upon release from prison." At the trial, Long acknowledged that, since Father had been incarcerated at all pertinent times, DCS had no proof that he had any ability at all to provide support. Father remained incarcerated as of the trial date, so factual findings that he failed to obtain stable housing and failed to participate in post-release family counseling can only be described as baffling.

We note that this holding does not affect the custody of Askia, which remains with Foster Mother. It likewise does not preclude the future termination of Father's parental rights, should grounds for such termination be properly proven.

The decision of the trial court is reversed in part and affirmed in part, as set forth above, and the cause is remanded for further proceedings consistent with this Opinion. Costs on appeal are assessed against Appellee Tennessee Department of Children's Services, for which execution may issue if necessary.

_____
HOLLY M. KIRBY, JUDGE